# In the United States Court of Federal Claims

No. 16-215C
Filed: September 28, 2016

| | |
|---|---|
| FEDERAL CONTRACTING, INC., d/b/a BRYAN CONSTRUCTION, INC., Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant. | Keywords: Contract Disputes Act; Breach of Contract; Performance Bond; Sum Certain; Performance Evaluation; Termination for Cause; Termination for Convenience. |

*J. Taylor Benson*, Benson Law Office, Colorado Springs, CO, for Plaintiff.

*Robert C. Bigler*, Trial Attorney, Commercial Litigation Branch, Civil Division, with whom were *Claudia Burke*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Washington, DC, for Defendant. *Pietro Mistretta*, Attorney, Office of Counsel, U.S. Army Corps of Engineers, Winchester, VA, Of Counsel.

**OPINION AND ORDER**

**KAPLAN, Judge.**

Currently before the Court in this contract case are the government's motion to partially dismiss the complaint of Plaintiff Federal Contracting, Inc. d/b/a Bryan Construction, Inc. (FCI) and FCI's cross-motion for a default judgment as to Count III of its complaint. The government's motion seeks dismissal of Counts I, II, and IV of the complaint pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims (RCFC). FCI seeks a default judgment against the government as to Count III of its complaint.

As discussed below, the Court agrees with the government that it lacks jurisdiction over Counts I and II of FCI's complaint seeking monetary damages for breach of contract because FCI failed to submit a valid, certified claim alleging such a breach to the contracting officer (CO) pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101–09. However, the Court rejects the government's jurisdictional objections to Count IV of FCI's complaint. In that Count, FCI challenges and seeks an order directing the government to withdraw an unsatisfactory evaluation of FCI's

performance on the contract. Contrary to the government's argument, the Court concludes that FCI did submit that claim to the CO as required by the CDA and received a final decision from the CO as to that claim. Accordingly, the government's motion to dismiss is **GRANTED-IN-PART** and **DENIED-IN-PART**. In addition, for the reasons discussed below, FCI's cross-motion for default judgment is **DENIED**.

## BACKGROUND[1]

### I.    The Contract

On January 23, 2015, the United States Army Corps of Engineers (USACE) awarded FCI a contract for the construction of a medical warehouse on the premises of Al Udeid Air Base, Qatar (Al Udeid). Compl. ¶ 5, ECF No. 1. The contract was a firm fixed-price contract in the amount of $4,899,425. Id. FCI was to complete the building by January 28, 2016. See id. ¶ 6.

On March 19, 2015, USACE sent FCI a Letter of Concern regarding the timeliness of several mandatory pre-construction submissions.[2] Compl. ¶ 13; Def.'s Mot. to Dismiss (Def.'s Mot) App. at A1, ECF No. 10-1. The agency expressed its concern that FCI's "fail[ure] to provide [the] required submittals . . . put[] the project at risk." Id. On May 5, 2015, USACE sent FCI a Notice of Intent to Issue [an] Interim Unsatisfactory Performance Appraisal, stating that "the contract continues to fall behind schedule" and that there were "no indication[s] that [FCI] is making sufficient progress in recovering lost time." Id. at A5; see also Compl. ¶ 16.

On April 28, 2015, FCI invoiced USACE for a progress payment in the amount of $33,997.00. See Compl. ¶ 53. The progress payment was to reimburse FCI for the cost of performance and payment bonds it obtained in February 2015. Id. at 52–53. FCI then responded to USACE's Letter of Concern on May 8, 2015, arguing that USACE had not "accurately represent[ed] [its] performance on the project" because it "identifie[d] old issues that have since been overcome." Def.'s Mot. App. at A11. FCI also contended that the notice "appeare[d] to be written in a vindictive manner." Id.

On May 14, 2015, USACE issued an Interim Unsatisfactory Performance Appraisal identifying six major unresolved performance issues. Id. at A12–13; see also Compl. ¶¶ 16–17. Two weeks later, on May 28, 2015, the agency followed up with a Cure Notice, which stated that USACE considered FCI's "failure to progress

---

[1] The facts in this section are based on the documents attached to the parties' briefs as well as the allegations in Plaintiff's complaint, which the Court assumes to be true for purposes of deciding the motion to dismiss.

[2] USACE considered Al Udeid a "special work environment" presenting certain logistical difficulties, including issues related to obtaining base access badges for the contractor's personnel and construction permits from the Qatari government. See Def.'s Mot. App. at A9.

satisfactorily as a refusal to prosecute the work with the diligence that will ensure its completion within the time specified in the contract." Def.'s Mot. App. at A16; see also Compl. ¶ 20. The agency noted that FCI had not "sufficiently demonstrated its plan to perform 20% of the construction, as required by the contract" or "completed any mobilization or any physical work at the site." Def.'s Mot. App. at A17. As a result, USACE warned FCI that it "m[ight] terminate this contract for default" if FCI failed to cure the deficiencies within ten days. Id. at A16.

FCI responded to the Interim Unsatisfactory Performance Appraisal and the Cure Notice on June 8, 2015. Id. at A19–38; see also Compl. ¶ 23. It claimed that "the basis for the Cure Notice [was] factually incorrect," and argued that it was attempting in good faith to perform and that the performance delays were justified by circumstances beyond its control. See Def.'s Mot. App. at A20–22. It also contended that it still had adequate time to meet the contract's completion date. Id. at A30, A33, A38. FCI also noted that it "strongly disagree[d]" with the interim performance evaluation and "formally request[ed]" its withdrawal. Id. at A35, A38. On June 29, 2015, FCI again requested that the interim unsatisfactory evaluation be withdrawn, arguing that it contained inaccuracies and inconsistencies and that USACE did not adhere to the proper evaluation methodology or best practices guidelines. Id. at A49–50.

On July 6, 2015, USACE issued a Show Cause Notice stating that it was considering terminating FCI's contract for default. Id. at A51; see also Compl. ¶ 29. The agency gave FCI ten days to present mitigating circumstances demonstrating that its failure to perform arose out of causes beyond its control and without FCI's fault or negligence. Def's Mot. App. at A51.

The show cause notice also stated that FCI's request for withdrawal of the interim unsatisfactory CPARS evaluation was denied. Id. at 55. On July 13, 2015, the agency finalized FCI's unsatisfactory performance evaluation. See Pl.'s Opp'n to Def.'s Mot. to Partially Dismiss Compl. (Pl.'s Opp'n) App. at A248–52, ECF No. 11-2. The final performance evaluation included comments from FCI, in which it expressed its disagreement with the evaluation and "request[ed] that it be reevaluated." Id. at A250–52.

FCI responded to the Show Cause Notice on July 23, stating its belief that USACE "ha[d] no intention of cooperating with [FCI]," and that USACE had breached the contract by failing in its "duty not to hinder, delay, or increase the cost of performance via its unreasonable exercise of discretion." Def.'s Mot. App. at A58–59. FCI also requested that the contract be terminated for convenience. Id. at A59.

On July 30, 2015, USACE notified FCI that it had not processed FCI's invoices requesting reimbursement for its payment of bond premiums because of certain irregularities in FCI's submission. Compl. ¶ 54. According to FCI, by letter of July 31, 2015, it advised USACE that it had remedied the irregularities; nonetheless, USACE did not pay the invoices. Id. at ¶ 56.

3

**II.     USACE's Termination of the Contract and FCI's Communication with the CO Following the Termination**

On August 3, 2015, USACE issued a Notice of Termination for Default, stating that FCI's "response to [the] Show Cause Notice did not provide any information which demonstrated that [it] could meet the required completion date of the contract," and that it "did not show that the default otherwise was beyond [FCI's] control and without [its] fault or negligence." Def.'s Mot. App. at A76; see also Compl. ¶ 32. The Notice of Termination also outlined twenty-six acts or omissions constituting the default, and stated that the notice "constitute[d] [USACE's] final decision that [FCI] is in default." Def.'s Mot. App. at A92.

On August 12, 2015, FCI responded to the Notice of Termination. Id. at A94. It contended that the Notice of Termination was "void and defective" because (among other things) USACE had "committed a material Anticipatory Breach by neglecting to reimburse [FCI] for its Bond Premiums for Bonds furnished on the Contract." Id. Further, it argued that USACE was "wrongfully holding Bonds for which the required consideration has not been paid" and requested "that the Government return the bonds." Id. at A96.

On September 28, 2015, FCI sent the CO another letter, in which it purportedly "identif[ied] the grounds for [the] improper Default Termination" and "formally request[ed] concurrent Inspector General (IG) and Criminal Investigation Division (CID) investigations into USACE's contract management of [the] contract." Id. at A98. FCI claimed that USACE had breached its duty of good faith and fair dealing by intentionally withholding an approved dig permit for the project. Id. at A98–100. FCI also stated that default termination is a "drastic sanction" which should only be imposed for "good grounds and on solid evidence," and alleged that USACE failed to cooperate with FCI and did not attempt to engage in routine contract administration activities to resolve factual disputes. Id. at A102.

USACE responded to this letter on October 2, 2015, stating that the government would "look into the allegations [raised] regarding the dig permit" but that it "unequivocally disagree[d] with [the] allegation that it acted in bad faith." Pl.'s Opp'n App. at A221. The agency reiterated that its decision to terminate the contract for default remained in effect. Id. On October 15, 2015, USACE sent a follow-up letter stating that it had investigated the dig permit allegation and determined that FCI's allegations were "unsubstantiated." Id. at A222.

FCI replied by letter on December 7, 2015, stating that it was dissatisfied with USACE's "lack of transparency . . . and cooperation" with regards to the internal investigation into the dig permit. Def.'s Mot. App. at A104. FCI also claimed that the agency's failure to provide it with the dig permit before August 20, 2015 led to a "Government-caused delay," and that the Termination for Default was improper in light of that delay. Id. at A104–05. FCI then "formally request[ed] that USACE immediately convert this Termination for Default into a Termination for the Convenience of the Government" and indicated that it was ready "to pursue a full and appropriate resolution

4

of this matter via any administrative and/or legal recourse that may be necessary." Id. at A109.

### III.   This Action

FCI filed a four-count complaint in this Court on February 12, 2016. In it, FCI alleged: (1) that USACE breached the contract by violating the duty of good faith and fair dealing; (2) that USACE breached the contract by failing to reimburse FCI for the bond premium payments; (3) that USACE wrongfully terminated FCI for default; and (4) that the interim unsatisfactory performance evaluation was "unfair, inaccurate, erroneous, biased, and an abuse of discretion." Compl. ¶¶ 57–60. As relief, FCI requested that the Court: (1) enter judgment in its favor as to its breach of contract claims; (2) grant damages in the amount of $4,899,425; (3) declare the unsatisfactory performance evaluation null and void; (4) direct USACE to "take proper and just actions to remedy the unlawful Unsatisfactory Performance Evaluation"; (5) declare that the Government's termination of the Contract for default was wrongful and convert it to a termination for convenience; and (6) award reasonable attorney's fees, costs, and expenses. Id. at 8.

On May 27, 2016, the government moved to dismiss the first, second, and fourth counts of FCI's complaint, arguing that those counts are subject to the CDA and that FCI failed to submit any valid claims or obtain final decisions from the CO before filing its complaint. Def.'s Mot. at 13–14. The government also asked the Court to stay the third cause of action (regarding the allegedly wrongful termination for default) until FCI files an amended complaint following a CO's determination as to the breach of contract and improper evaluation claims. Id. at 14.

FCI responded on June 13, 2016. ECF No. 11. Along with its response, FCI moved for a default judgment as to the third count of its complaint. Id. at 25–27. The government filed its reply on June 30, 2016, ECF No. 12, and oral argument was held on September 27, 2016. The motions are now ripe for decision.

## DISCUSSION

### I.   Standards for Motions to Dismiss Under RCFC 12(b)(1)

Whether this Court has subject-matter jurisdiction is a threshold matter, and, if no jurisdiction exists, the Court must order dismissal without proceeding further. See PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998)). In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the plaintiff's complaint and draws all reasonable inferences in favor of the plaintiff. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). If subject matter jurisdiction is challenged, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The party invoking a court's jurisdiction bears the burden of establishing it, and must

ultimately do so by a preponderance of the evidence. Id.; see also Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).

## II.     The Court's Jurisdiction Over CDA Claims

### A.     Tucker Act

Pursuant to the Tucker Act, the United States Court of Federal Claims may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a) (2012). Subsection (a)(2) of section 1491 further grants the Court of Federal Claims "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41"—that is, the CDA—"including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." Id. § 1491(a)(2).

### B.     The Contract Disputes Act

The CDA covers all claims based upon "any express or implied contract . . . made by an executive agency for—(1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair, or maintenance of real property; or (4) the disposal of personal property." 41 U.S.C. § 7102(a) (2012). Under the CDA, "procurement" means "the acquisition by purchase, lease or barter, of property or services for the direct benefit or use of the Federal Government." New Era Constr. v. United States, 890 F.2d 1152, 1157 (Fed. Cir. 1989) (quotation and emphasis omitted).

The CDA sets forth its own jurisdictional requirements. See M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327–28 (Fed. Cir. 2010). In particular, it states that a contractor may bring an action de novo in federal court "within 12 months from the date of receipt of a contracting officer's decision." 41 U.S.C. § 7104(b)(3), (4). Thus, the Federal Circuit has held that for the Court of Federal Claims to possess jurisdiction, the contractor must have first submitted a valid claim to the contracting officer and received the contracting officer's final decision on that claim. M. Maropakis Carpentry, 609 F.3d at 1327–28; see also Dalton v. Sherwood Van Lines, Inc., 50 F.3d 1014, 1017 (Fed. Cir. 1995) ("When the [CDA] applies, it provides the exclusive mechanism for dispute resolution; [it] was not designed to serve as an alternative administrative remedy, available at the contractor's option.").

The definition of "claim" for purposes of the CDA derives from the FAR, which implements the CDA. See M. Maropakis Carpentry, 609 F.3d at 1327–28. FAR 2.101 provides, in pertinent part, that "claim" means "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising

6

under or relating to the contract." Id.; see also FAR 52.233-1 (setting forth, in a standard contract clause, the same definition of "claim").

In interpreting the CDA, the Federal Circuit has held that a valid claim for payment consists of three components: "(1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain." Northrop Grumman Computing Sys., Inc. v. United States, 709 F.3d 1107, 1112 (Fed. Cir. 2013) (citing Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1575–76 (Fed. Cir. 1995)). The Federal Circuit has further explained that "a valid claim under the CDA must contain 'a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim,'" but that it "need not take any particular form or use any particular wording." Id. (quoting Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987)). Instead, "[a]ll that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." Id. (quoting Contract Cleaning Maint., Inc., 811 F.2d at 592).

For claims seeking more than $100,000, FAR 2.101 additionally incorporates within the definition of "claim" the CDA's certification requirement. 41 U.S.C. § 7103(b)(1). That requirement provides as follows:

> For claims of more than $100,000 made by a contractor, the contractor shall certify that--
>   (A) the claim is made in good faith;
>   (B) the supporting data are accurate and complete to the best of the contractor's knowledge and belief;
>   (C) the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable; and
>   (D) the certifier is authorized to certify the claim on behalf of the contractor.

Id.; see also FAR 33.207(c) (providing specific certification language, which includes the language of § 7103(b)(1) nearly verbatim).

In addition, "[b]esides meeting the FAR definition of a claim, the CDA also requires that all claims be submitted to the contracting officer for a decision." James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1543 (Fed. Cir. 1996); see also M. Maropakis Carpentry, 609 F.3d at 1327–38. The contractor is not required to make a single, "explicit request for a final decision." James M. Ellett Constr., 93 F.3d at 1543. Rather, "as long as what the contractor desires by its submissions is a final decision, that prong of the CDA claim test is met." Id. (quoting Transamerica Ins. Corp., Inc. ex rel. Stroup Sheet Metal Works v. United States, 973 F.2d 1572, 1576 (Fed. Cir. 1992), overruled on other grounds by Reflectone, Inc., 60 F.3d at 1582–83.

7

**III.     Whether the Court has Jurisdiction Over Counts I, II, and IV of FCI's Complaint**

    **A.     Counts I and II**

In Count I of its complaint, FCI alleges that USACE breached the contract by violating the duty of good faith and fair dealing. Compl. ¶ 57. According to the allegations in Count I, "no meeting of the minds occurred as USACE held no preconstruction meeting, [s]ubmittals were not approved, and no cooperation took place." Id. In Count II, FCI claims that USACE breached the contract by "fail[ing] to reimburse [it] for surety bond payments in the amount of $33,997.00, as required by FAR 52.232-5." Compl. ¶ 58. FCI further alleges in Count II that the government's failure to provide reimbursement and its termination of the contract for default "while continuing to assert payment and/or performance on the contract from the bonding company. . . has unfairly impacted [FCI's] bonding capacity." Id. As a remedy for each of these two breaches, FCI requested "costs to be determined at a later date, pursuant to the contract amount of $4,899,425.00." Id. at ¶¶ 57, 58.

FCI does not contest that the CDA applies to these claims. See Pl.'s Opp'n at 9. And it also does not allege in its complaint that it submitted certified claims to the CO concerning the allegations of breach of contract set forth in Counts I and II. Nonetheless, it argues in its response to the government's motion to dismiss that it effectively submitted its breach of contract claims to the CO in its responses to USACE's May 28, 2015 Cure Notice and its July 6, 2015 Show Cause Notice. See id. at 10. FCI further argues that USACE's Notice of Termination for Default constituted the CO's final decision as to those claims. See id.

FCI's arguments lack merit. FCI's responses to the Cure Notice and Show Cause Notice did not constitute valid claims for payment under the CDA for alleged breaches of contract because, among other reasons, FCI never requested payment for such claims in a sum certain, which is a requirement for a valid claim seeking monetary damages. See Northrop Grumman Computing Sys., 709 F.3d at 1112; Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1266–67 (Fed. Cir. 1999). Indeed, FCI concedes that it did not request payment in a sum certain with respect to either Count I or Count II of its complaint, opining that it would be "premature to certify a sum certain at this point in time" because the Termination for Default might be converted to a Termination for Convenience. See Pl.'s Opp'n at 18. And because FCI never requested a sum certain, it also necessarily failed to comply with the CDA's certification requirement for claims over $100,000, which requires contractors to certify that "the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable." See 41 U.S.C. § 7103(b)(1).

Nor did FCI present a valid claim to the contracting officer in its August 12, 2015 letter responding to the Notice of Termination. In that letter it stated, among other things, that USACE had committed a "material Anticipatory Breach by neglecting to reimburse FCI for its Bond Premiums for Bonds furnished on the Contract." Def.'s Mot. App. at A94. It also observed that "USACE is wrongfully holding Bonds for which consideration

8

has not been paid" and requested "that the Government return the Bonds." Id. at A96. The letter, however, does not request payment of a sum certain as damages for any alleged breach of contract. Indeed, the letter had another independent purpose: to seek relief from the default termination order. See id. (stating that the purpose of FCI's August 12, 2015 letter was to "notify[] the Government that its Anticipatory Breach and failure to notify the Surety Bonding Companies are asserted as strong defenses to the Termination for Default action"). This correspondence, accordingly, does not constitute a valid claim for damages under the CDA. See Armour of Am. v. United States, 69 Fed. Cl. 587, 592 (2006) (no valid claim for convenience damages under CDA where "letter from Plaintiff to the [CO] merely requests reconsideration of the default termination," where "[t]here is no evidence of record before the Court to show that Plaintiff requested monetary damages of a sum certain," and where "there was no final decision by the [CO] on a claim for convenience termination monetary damages").

Similarly, as described above, FCI's letters of September 28, 2015, and December 7, 2015, did not constitute valid claims under the CDA. In the former letter, FCI again complained about the termination for default and also requested inspector general and criminal investigations of USACE's management of the contract. See Def.'s Mot. App. at A98. The subsequent December letter repeated FCI's request for investigation and provided a series of questions for the CO to answer. See id. at A104–09. Nowhere in either letter does FCI assert a claim for damages for breach of contract in a sum certain.

In short, FCI has not complied with the CDA's exhaustion requirements as to Counts I and II of its complaint. Therefore, the government's motion for partial dismissal of the complaint as to those Counts must be granted.

### B.     Count IV

The government has also moved to dismiss Count IV of the Complaint, in which FCI asks the Court to set aside its interim unsatisfactory performance evaluation because it was "unfair, inaccurate, erroneous, biased, and an abuse of discretion." Compl. ¶ 60; see also id. at 8. It contends that FCI failed to meet the CDA's exhaustion requirements as to this claim as well. See Def.'s Mot. at 12–13. The Court disagrees.

Courts have regularly held that a contractor's challenge to an agency's performance evaluation may constitute a claim under the CDA. See Todd Constr. L.P. v. United States, 85 Fed. Cl. 34, 45–46 (2008); BLR Grp. of Am., Inc. v. United States, 84 Fed. Cl. 634, 647–48 (2008). Because FCI seeks non-monetary relief for this claim, the CDA requires only that it have submitted a written demand for a final decision seeking relief from the unsatisfactory performance evaluation as a matter of right and received a final decision on that claim. See M. Maropakis Carpentry, 609 F.3d at 1327–28; Alliant Techsystems, Inc., 178 F.3d at 1266–68.

The correspondence between FCI and the government reveals that FCI met this requirement. In a June 8, 2015 letter, FCI informed the CO that it "strongly disagree[d]" with the unsatisfactory performance evaluation and "formally request[ed]" its withdrawal. Def.'s Mot. App. at A35, 38. In a second letter on June 29, 2015, FCI again

9

"request[ed] that the CPAR evaluation be withdrawn." Id. at A49. The CO responded on July 6, 2015, stating that "[y]our request . . . for withdrawal of the Interim Unsatisfactory CPARS evaluation is denied." Id. at A55. And on July 13, 2015, the unsatisfactory evaluation was finalized. Pl.'s Opp'n App. at A244–52. This correspondence is sufficient to meet the CDA's requirements that FCI submit a written demand for a final decision seeking relief from the unsatisfactory performance evaluation as a matter of right and that it receive a final decision on that claim from the CO. See BLR Grp. of Am., 84 Fed. Cl. at 636–37, 647–48 (written comments to initial performance evaluation which claimed entitlement to the relief of a corrected CPAR satisfied plaintiff's obligation to file claim with the CO for purposes of the CDA).

The Court finds unpersuasive the government's argument that FCI's letters do not constitute a written demand seeking relief as a matter of right under the CDA because FCI "has not demanded anything, but has only requested that the evaluation 'be withdrawn.'" Def.'s Mot. at 12–13. This argument elevates form over substance. In common usage, a demand is an authoritative or formal type of request. See Webster's 3d New Int'l Dictionary 598 (1961). Here, as noted, FCI "formally request[ed]" withdrawal of the evaluation, which the CO denied. In short, the government's argument—that FCI failed to meet the CDA's requirements because it couched its action as a "formal request" rather than a "demand"—lacks merit.[3]

Accordingly, the Court concludes that FCI submitted a claim to the CO within the meaning of the CDA, and received the CO's final decision on that claim. Thus, the Court has jurisdiction over Count IV of FCI's complaint.

## IV. FCI's Cross-Motion for a Default Judgment as to Count III and Further Proceedings in this Case

The government concedes that the Court has jurisdiction over Count III of FCI's complaint (claiming that the Termination for Default was unlawful and should be converted to a Termination for Convenience), at least to the extent that FCI seeks declaratory relief. See Def.'s Mot. at 8 n.2. In its motion to dismiss, it asks the Court to stay the case pending the receipt of a CO's decision on FCI's other claims.

---

[3] In its motion to dismiss, the government argues that even if the June 29, 2015 letter made a valid claim with respect to the unsatisfactory evaluation, the CDA's requirements have not been met because, it argues, the letter requests different relief than FCI requested in Count IV. It notes that "[t]he letter simply requests that the evaluation be withdrawn, but in its complaint, FCI demands that the evaluation '(1) be declared unlawful and should be set aside, and (2) should be removed from' various reporting systems." Def.'s Mot. at 13 (quoting Compl. ¶ 60). The Court does not perceive a request that the Court "set aside" the evaluation and direct the government to remove it from official reporting systems to differ in any material respect from a formal request that the evaluation be withdrawn.

Citing Gerlach v. Mich. Bell Tel. Co., 448 F. Supp. 1168, 1174 (E.D. Mich. 1978), FCI has moved for a default judgment based on the government's failure to timely respond to Count III. See Pl.'s Opp'n at 25–28. In that case, the district court concluded that the filing of a motion under Fed. R. Civ. P. 12(b) does not alter the time within which the moving party must respond to claims in the complaint that are not addressed in the motion. Gerlach, 448 F. Supp. at 1174–75.

To the Court's knowledge, however, "[n]o other court has adopted the Gerlach court's reasoning or ruling; indeed, every court to consider the decision in Gerlach on this point has disagreed with and declined to follow it." Talbot v. Sentinel Ins. Co., No. 11-cv-1766, 2012 WL 1068763, at *4 (D. Nev. 2012) (quoting Ideal Instruments, Inc. v. Rivard Instruments, Inc., 434 F. Supp. 2d 598, 638 (N.D. Iowa 2006)). Instead, courts have held that under the language of Fed. R. Civ. P. 12(a) (which is identical to RCFC 12(a)), a partial 12(b) motion enlarges the time to file an answer. E.g., Circuit City Stores, Inc. v. Citgo Petroleum Corp., No. 92-cv-7394, 1994 WL 483463, at *4 (E.D. Pa. Sept. 7, 1994) (citing Brocksopp Eng'g, Inc. v. Bach–Simpson, Ltd., 136 F.R.D. 485, 486 (E.D. Wis. 1991)).

This Court agrees with the reasoning expressed in those cases that "the filing of a motion that only addresses part of a complaint suspends the time to respond to the entire complaint, not just to the claims that are the subject of the motion." Charles A. Wright & Arthur R. Miller, 5B Fed. Prac. & Proc. Civ. § 1346 (3d ed.); see also id. n.18 (citing cases). Further, even the court in Gerlach declined to impose the "harsh remedy" of a default judgment on the defendant based on its failure to respond to those counts in the complaint that were not the subject of its motion to dismiss. See 448 F. Supp. at 1174. In this case, as in Gerlach, FCI has not been prejudiced by the fact that the government did not file a response to Count III when it filed its motion to dismiss Counts I, II, and IV. For these reasons, FCI's motion for a default judgment is **DENIED**.

## CONCLUSION

For the reasons discussed above, the government's motion to dismiss is **GRANTED-IN-PART** and **DENIED-IN-PART**. Counts I and II of the Complaint are **DISMISSED** without prejudice. FCI's cross-motion for a default judgment is **DENIED**.

The case is **STAYED** pending the CO's final decision on the claims set forth in Counts I and II of FCI's complaint. The parties shall file a joint status report with the Court no later than **November 28, 2016** advising the Court of the status of the claims before the CO, and proposing a schedule to govern future proceedings in this case.

11

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge